1

2

3

4

5

6

7                        IN THE UNITED STATES DISTRICT COURT

8                     FOR THE EASTERN DISTRICT OF CALIFORNIA

9    HUNG PHUOC NGUYEN,

10            Petitioner,                    No. 2:02-cv-2758 LKK JFM (HC)

11       vs.

12   MIKE KNOWLES, et al.,

13            Respondents.                   FINDINGS & RECOMMENDATIONS

14   _____/

15            Petitioner is a state prisoner proceeding through counsel with an application for a

16   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction on

17   five counts of robbery in violation of California Penal Code § 211, one count of false

18   imprisonment in violation of California Penal Code § 236, with enhancements for personal use of

19   a handgun in violation of Cal. Penal Code 12022.53(b) and 12022.5(a).  This action is

20   proceeding on five claims for relief raised in petitioner's original petition.[1]

---

21       [1] Claims I and II are raised in pages 3-22 attached to the form petition.  At pages 25-48,
22   petitioner raises three additional claims identified as Claims I, II, and III.  In these findings and
     recommendations, the claims will be identified sequentially, as Claims One through Five.  In
23   addition, at pp. iv-v of the petition, petitioner claims that the state superior court violated
     petitioner's state constitutional rights when it held that it lacked jurisdiction over the claims
24   raised as Claims II and III in pages 25-48 of the attachment.  The court does not construe this as a
     separate claim for relief in these proceedings.  Even if it were, federal habeas corpus relief is only
25   available for violations of federal rights and is not available for alleged violations of the state
     constitution.  See 28 U.S.C. § 2254; see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994)
26   (quoting Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985)).

FACTS[2]

Early in the morning on June 3, 1998, a group of men wearing dark clothing and masks came in through the front door of the Silver Fox Casino. The victims identified the intruders as Asian by their accents and size. One victim recognized an intruder speaking in Vietnamese and using the name "Bao."

Upon entering, the men ordered the victims to the floor. Some victims recalled a suspect pointing his gun in the air and clicking it twice without gunfire. From the floor, victims were led to the card room. The robbers took money and wallets from the victims. Two victims testified to feeling a gun pressed behind their head or back. After having property taken, the victims were forced into the women's restroom.

While the victims were being moved and robbed, a suspect forced the casino shift manager, David Tran, into the "cage" to get the cashier money. When Tran stated he did not know where the rest of the money was, the suspect pointed a gun at him and kicked him in the back. An additional suspect broke the window to the casino office. A total of $31,400 in cash was taken from the casino. In addition, paychecks from the casino to Sandra Woodsworth, a robbery victim, were taken from the office.

After the robbery, the casino owner named an ex-employee, Thanh Do ("Andy") as a likely suspect to the robbery. The next day a stolen car containing blood, masks, and gloves was found three blocks north of the casino.

On August 25, 1998, police discovered guns at the home of Minh Nguyen, a felon, during an unrelated search. Minh, thinking that he was in trouble for the gun possession, gave the officers formation about the robbery. He testified that there were multiple meetings to plan the robbery. [Petitioner] was present at these meetings. Minh identified Thanh Do ("Andy"), Johnny Nguyen ("Johnny"), and [petitioner] as involved in the robbery. Minh's information took police to Andy and Johnny's homes, leading to their arrest.

The police then discovered that the blood at the casino and in the stolen car matched Johnny's blood type and markings. This blood type is present in only two to three percent of Asian males. Johnny also had lacerations on his hands, consistent with an injury from the broken window. Minh could only identify [petitioner] by

---

[2] This statement of facts is taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Nguyen, No. C032643 (July 27, 2001), a copy of which is attached as Exhibit D to Respondents' Answer to Petition for Writ of Habeas Corpus, filed April 9, 2003.

his nickname "Henry."  However, Minh did take police to [petitioner]'s home.  He also informed police that [petitioner] had taken a trip to Vietnam after the robbery.

A search of [petitioner]'s room on September 1, 1998, produced incriminating evidence.  Police recovered a white garbage bag with blood on it.  The bag was similar to the moneybag used in the robbery.  Additionally, police found ledgers with blood on them and the casino checks to Sandra Woodsworth in [petitioner]'s room.  [Petitioner] was arrested two days later in San Francisco.

Johnny Nguyen testified about numerous meetings at which plans to rob the casino were made.  [Petitioner] was present at each meeting except the first.  The final meeting occurred at a motel the night before the robbery.  Johnny named [petitioner], himself, and two other individuals, Bao and Duong, as participants in the robbery.  According to Johnny, Bao, Duong, and [petitioner] carried guns.  Johnny cut the phone lines and broke the office window, on which he cut his fingers.  [Petitioner] took the shift manager into the "cage" to get the cashier money.  Bao and Duong moved the victims into the restroom.

Johnny testified that after the robbery the four of them drove in a stolen car to Bao's car where the dropped off Bao and [petitioner] (who had the money).  Then Duong and Johnny drove to Johnny's car and took it back to the motel.  About an hour later Johnny, Bao, Duong, Andy, and [petitioner] met at [petitioner]'s house to split the money.  They received about $5600 each.

Minh's testimony confirmed [petitioner]'s presence at the meetings to plan the robbery.  Additionally, Minh testified that [petitioner] was at the motel the night before the robbery.  After the robbery, defendant, Johnny, and Andy came over to Minh's house.  Minh went out with [petitioner]later that night.  The guns were eventually brought back to Minh.

Prior to [petitioner]'s testimony, defense counsel met with the trial judge ex parte without the [petitioner] present to discuss an "ethical conflict."  Defense counsel felt that [petitioner] was going to present perjurious testimony.  Upon questioning from the judge, counsel indicated he had warned [petitioner] that perjury is a crime that poses strategic risks and advised him to testify truthfully.  Counsel also indicated he did not file a motion to withdraw and felt he could continue to represent [petitioner].  The court agreed with defense counsel that [petitioner] should present his testimony in a narrative manner.

In his testimony, [petitioner] described himself as a full-time student who likes to go out with his friends.  He described Johnny and Minh as gang members.  Though [petitioner] said he was not a gang member himself, it was stipulated in rebuttal that a deputy sheriff would testify that [petitioner] stated he was a member of the

"TL" (Tenderloin) gang from San Francisco when questioned about housing assignments in the jail. [Petitioner] admitted he heard conversations about the robbery on numerous occasions but dismissed the plans as a display to impress girls. According to the [petitioner], the day before the robbery Minh borrowed $100 to get a motel room to drink beer and invite girls over. Later that evening Minh told [petitioner] Andy had already rented a motel room. [Petitioner] was disappointed to find there were no girls present at the motel and left after one beer. He testified the others discussed the casino robbery at the motel. He left the motel to go to karaoke at "Keyholes," where he met his friend Justin and some girls.

[Petitioner] testified Minh, Johnny, Andy, and Duong arrived at his house the next morning to clean their guns and count their money. Johnny was bleeding. [Petitioner] watched television while the others were in his room and went back to sleep once they left. Minh offered defendant $400 but defendant only accepted the $100 Minh owed him. [Petitioner] cleaned the trash from his room and checked to make sure there was no blood in the house.

Weeks after the robbery Johnny, Johnny's girlfriend, and [petitioner] went to Vietnam together. [Petitioner] estimated that he spent about $4000 there, $2000 of which he claimed was from his sister. His sister corroborated this but had no receipts to show she had given [petitioner] any money. In addition to the trip, [petitioner] brought a pager, a "fake" Movado watch, and spent $775 in car repairs after the robbery. When he went to Vietnam [petitioner] was behind on his rent. He claimed to have paid the landlord's wife but this was contradicted by a stipulation.

People v. Nguyen, slip op. at 2-6.

ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

/////

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment.  See Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Federal courts must presume that state court's factual findings are correct unless defendant rebuts this presumption with clear and convincing evidence. 28 U.S.C.A. § 2254(e)(1).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  Where a state court has not reached the merits of a petitioner's claim, the AEDPA's deferential standard in § 2254(d) does not apply and a federal habeas court must review the claim de novo.  See Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

/////

1   II.  Petitioner's Claims

2        A.  Disclosure of Potential Perjury

3             Petitioner's first claim for relief is that his rights under the Confrontation Clause

4   of the Sixth Amendment, the Due Process Clause of the Fourteenth Amendment, as well as his

5   Sixth Amendment right to counsel were violated in connection with an *in camera* meeting

6   between the trial court and petitioner's counsel held without petitioner present.  Petitioner's

7   second claim is that his trial counsel provided ineffective assistance by discussing  with the trial

8   court at that in camera meeting "his belief that petitioner intended to perjure himself without

9   possessing a firm factual basis for that belief."  Petition, filed December 30, 2002, at 17.   The

10  last reasoned state court rejection of these claims is the decision of the Sacramento County

11  Superior Court on a petition for writ of habeas corpus filed by petitioner in that court.  The state

12  superior court denied the claims as follows:

13             Claims that could have been raised on appeal are not grounds
             for relief unless the petitioner can show that (1) clear and
14           fundamental constitutional error strikes at the heart of the trial
             process; (2) the court lacked fundamental jurisdiction; (3) the court
15           acted in excess of jurisdiction; or (4) a change in law after the
             appeal affected the petition.  (In re Dixon (1953) 41 Cal.2d 756,
16           759; In re Harris (1993) 5 Cal.4th 813, 828.)  Generally, claims of
             ineffective assistance of counsel are not barred by the above
17           doctrine.  (See In re Robbins (1998) 18 Cal.4th 770, 814, fn. 34.)

18             Both of Petitioner's claims could have been raised on appeal as
             they related solely to conduct occurring during trial.  Petitioner
19           attempts to support his claim with trial transcripts.  Although
             claims of ineffective assistance of counsel are normally not raised
20           on appeal because they relate to conduct not reflected in the record,
             in this case all of the conduct complained of appeared in the
21           record.  As such, the claim of ineffective assistance of trial counsel
             should have been raised on appeal, as is true of the claim that
22           Petitioner was improperly excluded from an *ex parte* hearing.
             Since they were not raised on direct appeal and relate solely to
23           evidence in the record, they are barred.

24             . . . .

25             Petitioner states that the issues were not raised on appeal
             because appellate counsel failed to raise them.  To the extent the
26           petitioner alleges ineffective assistance of appellate counsel,

1   Petitioner did not and cannot show prejudice, i.e., that had
appellate counsel included the claims in the appeal, there is a
2   reasonable probability that the result would have been different.
Petitioner cites primarily two cases to support his claim.  He
3   analogizes his case to People v. Ebert (1988) 199 Cal.App.3d 40
for the proposition that he was wrongfully excluded from the *ex*
4   *parte* hearing between counsel and the court about his potentially
perjurious testimony.  Ebert, however, is distinguishable because
5   the defendant in that case was proceeding *in pro per* and advisory
counsel was allowed to withdraw following the *ex parte* hearing,
6   leaving the defendant – who had not been given proper Faretta
warnings – unrepresented.  Here, Petitioner was not representing
7   himself and his attorney did not seek to withdraw; therefore, he
was not unrepresented.  Similarly, Petitioner cites Lowery v.
8   Cardwell (1978) 575 F.2d 727 (9th Cir.) to support his claim that
his attorney's actions caused a conflict of interest.  In Lowery, the
9   attorney sought to withdraw for undisclosed reason, indicating to
the court – the trier of fact – that the attorney believed the
10  defendant was lying.  Unlike Lowery, trial counsel in this case
explained that he thought Petitioner would commit perjury *to the*
11  *trial court, not to the jury*.  In addition, counsel did not seek to
withdraw, but rather stated that he had warned Petitioner that
12  perjury was a crime and advised Petitioner to testify truthfully, and
felt that he could continue to represent Petition.  Counsel had a
13  duty not to elicit perjury; Petitioner has failed to show that
counsel's conduct was improper or that the claim likely would
14  have resulted in a reversal of his conviction.

15
16  In re Hung Phouc Nguyen, Case No. 01F09943 (Jan. 9, 2002).  Respondents contend that these

17  claims are barred by the doctrine of procedural default.  In the alternative, respondents contend

    that the claims are without merit.
18
19      1.  Procedural Default

20      Respondents contend that these claims are barred by the doctrine of procedural

    default because the Sacramento County Superior Court rejected the claim with a citation to In re
21
    Dixon, 41 Cal.2d 756 (1953).  Where, as here, the state court's citation to Dixon includes
22
    reference to the constitutional error exception, application of the Dixon rule does not bar federal
23
    review of petitioner's claims.  See Park v. California, 202 F.3d 1146, 1153 (9th Cir. 2000) .
24
        2.  Merits
25
        Petitioner's claims arise from the following facts.  Trial commenced on February
26

23, 1999.  Reporter's Transcript on Appeal (RT), Vol I.   Jury selection was completed on March

1, 1999, and the prosecution's case in chief started on the same day.  Id.  At the start of the

afternoon session on March 1, 1999, the court dismissed the jury until the next day.  Id. at 74.

Thereafter, the court took up a few matters with the prosecutor, Mr. Durenberger, and defense

counsel, Mr. Salinger.  Id. at 74-78.  At the conclusion of those matters, the court held a

conference with defense counsel to discuss an issue defense counsel had raised with the court ex

parte.  Id. at 78.  Neither petitioner nor the prosecutor were present during the conference.  Id.

Prior to the conference, the following statements were made on the record, in petitioner's

presence:

> THE COURT:  Okay.  Mr. Salinger, I need to discuss with you the issue you raised ex parte.  I think Mr. Durenberger is leaving the courtroom, and I do not plan to discuss the merits of the case with you, only your professional responsibilities with your client, for the record.

> MR. SALINGER:  Thank you.  With that, perhaps I'll leave it there and make a record about what I'd like to discuss with you.

> MR. DURENBERGER:  Your Honor, I just received a page, I think it's from my detective, about one of the witnesses, so if I could just take it in back?

> THE COURT:  Would you close the door for me.

> MR. DURENBERGER:  Certainly.

> THE COURT:  I'll be right with you.  Have a seat, Mr. Salinger.

> (Interruption.)

> THE COURT:  I think we can probably discuss this without the defendant here.  We can probably just return him to his cell, and then I can discuss your professional responsibilities with you, Mr. Salinger.

> Does that make sense?

> MR. SALINGER:  Yes, your Honor.

> THE COURT:  All right.  That will conclude these proceedings. Henry [petitioner], we'll see you tomorrow morning at nine o'clock.

1          MR. SALINGER:  All right.

2  Id.  After petitioner left the courtroom, the court made the following statement on the record:

3          THE COURT:  Let's go back on the record.  The defendant is no
            longer in court, and for the record, Mr. Salinger has raised with the
4          Court, ex parte, what he felt was an ethical conflict due to the fact
            that his client, Henry, has elected to take the stand in this case and
5          to relate to the jury what Mr. Salinger perceives as perjurious
            testimony.

6

7  Ex. G to Answer, Confidential Reporter's Transcript on Appeal attached to Petition for Writ of

8  Habeas Corpus filed in Sacramento County Superior Court (CRT), at 80.  After an off the record

9  exchange between the court and counsel, the following exchange was recorded:

10         THE COURT:  . . . .  I have provided Mr. Salinger with what the
           Court has researched to be the proper things for defense counsel to
11         do in the event of this situation, namely, that his client should be
           adviced [sic] that perjury is a crime.

12
          Have you advised him of that?
13
         MR. SALINGER:  Yes.
14
         THE COURT:  And you need to also advise him of the strategic
15         risk of perjury.

16         MR. SALINGER:  Yes.

17         THE COURT:  Have you advised him about testifying truthfully
           and making full disclosure?
18
         MR. SALINGER:  Yes.
19
         THE COURT:  Have you considered presenting perjury or arguing
20         perjury to the Court or jury?

21         MR. SALINGER:  Yes, I have.

22         THE COURT:  And I don't believe you have asked to withdraw as
           counsel.  You believe you can continue to represent him, provided
23         you don't participate in the perjury?

24         MR. SALINGER:  Correct, you Honor.

25         THE COURT:  And it's your opinion that the defendant wishes to,
           nevertheless, take the stand against your advice?
26

MR. SALINGER:  Yes, your Honor.

THE COURT:  And for lack of a better term, free narrative approach will be used during direct exam?

MR. SALINGER:  Yes.

THE COURT:  And as I ascertained, Mr. Salinger, what you told me in my chambers and pretty much what you should do legally in this respect, and that is to simply elicit from the defendant who he is.  It's very fundamental background questions, and then, essentially, ask him a very large leading question, such as, Can you tell us what happened on June 3rd, 1998, at 6:30 a.m., and let him speak in narrative fashion.

I'm concerned, of course, because of the impact of that on the jury.  The jury will see the dichotomy or the difference between the defendant's testimony and all the other witnesses' testimony, but it seems to me he's put himself in that situation by putting you in this conflict situation, so it appears from the case law that this is the proper procedure to follow.

It also indicates, according to points and authorities I shared with you, you should not ask him specific questions that might elicit perjury, and, basically, the only way you can do that is to ask him narrative questions, and, or course, you can't, in your closing argument, make any reference to the jury anything he said that was perjurious.

MR. SALINGER:  To clarify that, -- in my closing argument, I was planning to use only facts that I believe is the truth.

Is that permissible?

THE COURT:  Yes.

MR. SALINGER:  Okay.

THE COURT:  In any event, that's what I believe we'll ascertain, and I believe, at the outset, you accurately described your duty to me in chambers, which, frankly, is an issue I hadn't faced as a trial judge for some peculiar reason.

It appears you came to the correct conclusion yourself, and that is, to ask your client leading questions, and you've represented you've done all the things the case law requires, told him about the dangers, told him he could be prosecuted, told him all the other things, including the strategic risk of lying to a jury potentially.

And beyond that, you can do nothing else but ask a leading question and hope that the jury doesn't include you,  uh, the

defendant's false statements to the jury, but I think you pretty much removed yourself by just asking the narrative question.

MR. SALINGER:  Very good, your Honor.  Just for the record, I'd like to clarify, since you will be the judge that will be imposing sentence, I have no firsthand knowledge, and it's just that he gave me one event of the facts, and now he's wanting to testify to another version of the facts.

THE COURT:  If I use the word perjury, I'm using it -- it's possible perjury, if that.  I'm not accusing your client of perjury, but I think that what you're saying, what he told the jury is so 180 degrees from what he told you, and whether that's perjury or not, when I say perjury, I meant purported or alleged or possible perjury.

Do you have any other questions, Mr. Salinger?

MR. SALINGER:  No, your Honor.  You've covered everything.

THE COURT:  Very good.  That will conclude these proceedings.

CRT at 80-83.  Subsequently, petitioner took the stand in his defense and testified in narrative fashion.  See Reporter's Transcript on Appeal (RT) at 333-342.  Petitioner testified through an interpreter.  Id. at 335, 337.  The prosecutor objected twice to the narrative form of petitioner's testimony; both objections were overruled.  Id. at 335.  In overruling the second objection, the court made the following statement:

THE COURT:  For the record, uh, Mr. Durenberger has an ongoing objection to the narrative answer of the defendant, which I'm overruling, and you've made your objection to me off the record, and I'm confirming it on the record, Mr. Durenberger, that you have concerns about allowing to speak in narrative form, but for reasons that don't concern the jury, I've overruled your objection and allowed him to speak in a narrative.

I will entertain objections about irrelevancy or any other evidentiary objections as the defendant speaks.  I've asked Mr. Nguyen to speak in short answers to that, uh, you can take notes, the Court can take notes, and we can proceed in a normal fashion as best we can.  With that, the objection is overruled.

Id. at 335-36.  The prosecutor cross-examined petitioner in a question and answer format.  Id. at 342-372.  On redirect, petitioner's counsel asked him if he had any response to the cross-examination or anything he wanted to add to his testimony.  Id. at 372.  The prosecutor again

1    objected to the narrative procedure, and the court overruled the objection. <u>Id</u>. Petitioner made

2    one clarification to his testimony. <u>Id</u>. Thereafter, the court asked petitioner a series of questions

3    concerning events prior to the robbery. <u>Id</u>. at 373-376. At the conclusion of the court's

4    questioning, the prosecution asked three more cross-examination questions. <u>Id</u>. at 376.

5                      a. <u>Right to Be Present</u>

6         Petitioner's first claim is that his exclusion from the conference between the judge

7    and defense counsel violated his rights, guaranteed by the Confrontation Clause and the Due

8    Process Clause, to be present at a critical stage of the proceedings, as well as his right to the

9    assistance of counsel.

10        The Confrontation Clause and the Due Process Clause guarantee to a criminal

11   defendant the right "to be present at every critical stage of the proceedings." <u>Insyxiengmay v.</u>

12   <u>Morgan</u>, 403 F.2d 657, 669 (9th Cir. 2005) (citing <u>Illinois v. Allen</u>, 397 U.S. 337, 338 (1970) and

13   <u>Faretta v. California</u>, 422 U.S. 806, 819 n.15 (1975)). A criminal defendant

14            has a due process right "to be present in his own person whenever
his presence has a relation, reasonably substantial, to the fulness of

15            his opportunity to defend against the charge." <u>Snyder v.</u>
<u>Massachusetts</u>, 291 U.S. 97, 105-06 (1934). Although the Court

16            has emphasized that this privilege of presence is not guaranteed
"when presence would be useless, or the benefit but a shadow," <u>id</u>.

17            at 106-107, due process clearly requires that a defendant be
allowed bo be present "to the extent that a fair and just hearing

18            would be thwarted by his absence," <u>id</u>. at 108. Thus, a defendant is
guaranteed the right to be present at any stage of the criminal

19            proceeding that is critical to its outcome if his presence would
contribute to the fairness of the procedure.

20

21   <u>Kentucky v. Stincer</u>, 482 U.S. 730, 745 (1987).

22         As noted above, petitioner was excluded from an in camera hearing between his

23   counsel and the judge where counsel informed the judge that he suspected petitioner might testify

24   falsely. The hearing took place after trial started but before petitioner testified.[3] At the hearing,

25  

26       [3] Respondents contend that counsel's discussion with the court was mandated by <u>Nix v.</u>
<u>Whiteside</u>, 475 U.S. 157 (1986). In <u>Nix</u>, the United States Supreme Court held that a criminal

counsel told the judge on the record that he had "no firsthand knowledge" but that petitioner had

given him one version "of the facts, and now he's wanting to testify to another version of the

facts." CRT at 82.  Counsel provided no description on the record of how petitioner's statements

to him differed.[4]

In the petition, which is signed under penalty of perjury, petitioner avers that "his

testimony at trial was truthful" and that he "knows of no reason why counsel would believe

petitioner intended to commit perjury."  Petition, filed December 30, 2002, at 6.  Petitioner has

presented evidence that suggests a language barrier may have affected his communications with

his attorney, see Affidavit of Petitioner Hung Phuoc Nguyen, attached to Supplemental Points

and Authorities in Support of Petitioner's Traverse, filed March 20, 2006 (hereafter Nguyen

Affidavit), and the record suggests that, while petitioner understands English, an interpreter was

present at trial to assist him.  See RT at 1 (Vietnamese interpreter sworn in); RT at 1-2 (counsel

for petitioner states that petitioner "understands about 80 percent of what is going on, so he can

first listen in English and have the translator available if he has questions" and petitioner affirms

that is what he wants); RT at 335, 337 (suggesting that petitioner testified through interpreter);

RT at 536 (court stating that petitioner "speaks pretty good English, but . . . needs [the

interpreter] periodically in case something comes up in court.")  Petitioner also avers that counsel

did not advise him that he would have to testify in narrative fashion or that he thought petitioner

would commit perjury, did not explain to petitioner what perjury was or how to testify, did not

defendant's constitutional right to the assistance of counsel is not violated by a defense attorney
who "refuses to cooperate with the defendant in presenting perjured testimony at his trial."  Nix,
475 U.S. at 159.   Nix does not, however, address the question presented by this claim:  whether
a defendant may be excluded from a conference at which the defendant's potential perjury is
discussed with the court.

[4]  During the in camera hearing, the judge stated "I'm not accusing your client of perjury,
but I think that what you're saying, what he told the jury is so 180 degrees from what he told
you."  CRT at 83.  The basis for this statement by the court is not clear from the record.
Moreover, the conference took place before petitioner testified; at that point petitioner had not
"told the jury" anything.

1   inform petitioner that he was going to tell the trial judge petitioner was going to commit perjury,

2   and never told petitioner about the in camera hearing with the judge.  Nguyen Affidavit at ¶¶ 12,

3   14.[5]

4           It is clear that petitioner had a due process right to be present at the in camera

5   hearing.  The substance of the discussion that took place at that hearing had a direct impact on

6   "'the fulness of his opportunity to defend against'" the charges he was facing.  Kentucky v.

7   Stincer, supra (quoting Snyder v. Massachusetts, supra).  Moreover, the fairness of that hearing

8   was severely compromised by his absence.  As the Eighth Circuit has held,

9           once the possibility of client perjury is disclosed to the trial court,
        the trial court should reduce the resulting prejudice. It should limit
        further disclosures of client confidences, inform the attorney of his
10          other duties to his client, inform the defendant of her rights, and
        determine whether the defendant desires to waive any of those
11          rights.

12

13  U.S. v. Long, 857 F.2d 436, 446 (8th Cir. 1988).  In the instant case, the trial court took none of

14  those steps and, indeed, took the erroneous view that petitioner's presence was not required.

15          For the foregoing reasons, petitioner's exclusion from the in camera hearing

16  violated his federal constitutional rights.  Two further issues remain:  (1) whether the error was

17  harmless or structural; and (2) whether the state court's rejection of the claim was an

18  unreasonable application of clearly established principles of United States Supreme Court law.

19  In the context of this action, these issues are intertwined.

20          Petitioner contends that the error was structural.  Petitioner's contentions are not

21  without persuasive force, given that, as petitioner correctly observes, at the hearing "the court and

22  _____

23          [5] In the petition, petitioner also avers that he first learned of the in camera hearing from
    his appellate counsel.  Petition at 5.  As noted above, the record reflects that petitioner was
24  present in court when the judge announced that he would meet with defense counsel and that
    petitioner's presence would not be required.  The comments made by the court in petitioner's
25  presence, however, would not, without more, have given petitioner notice of the substance of the
    discussions that ensued between the court and defense counsel.
26

retained trial attorney discussed whether petitioner would commit perjury, how trial counsel should proceed, and whether trial counsel should withdraw." Traverse, filed March 20, 2006, at 11. However, the contentions are insufficient to meet the stringent legal standard that is applied to review of the state courts' rejection of this claim. "The Supreme Court has never held that the exclusion of a defendant from a critical stage of his proceedings constitutes a structural error." Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir. 2005).[6]  Consequently, the state court's rejection of petitioner's claim cannot be set aside unless the error was not harmless under the standard set forth in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).[7]  Thus, the court looks at whether the error in excluding petitioner from the in camera hearing had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht, at 637 (quoting Kotteakos v. U.S., 328 U.S. 750, 776 (1946)).

/////

---

[6] As the Campbell court noted:

> The list of structural errors that the Supreme Court has recognized is short and limited. These structural errors include: "total deprivation of the right to counsel at trial," see Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); "a judge who was not impartial," see Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); "unlawful exclusion of members of the defendant's race from a grand jury," see Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); "the right to self-representation at trial," see McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); and "the right to[a] public trial," see Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), Fulminante, 499 U.S. at 309-10, 111 S.Ct. 1246. Since Fulminante, the Court has also recognized that "[d]enial of the right to a jury verdict of guilt beyond a reasonable doubt," is structural error. See Sullivan v. Louisiana, 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

Campbell at 1172.  The events at bar did not fall within any of those categories.

[7]  Although the state superior court held that both this claim and the related ineffective assistance of trial counsel claim should have been raised on direct appeal, it did per force reject both claims on the merits when it ruled that petitioner's appellate counsel had not been ineffective in failing to raise the claims.

1    As a result of the ex parte hearing, petitioner testified in narrative fashion.  In his

2    petition, petitioner avers that his trial testimony was truthful and that if he had been present at the

3    hearing he could have clarified any misunderstanding with his counsel.  The jury heard

4    petitioner's testimony and ultimately disbelieved it in material part.[8]  This court cannot find on

5    this record that the fact that petitioner presented his testimony in narrative form, rather than by

6    questions from his attorney, had a "'substantial and injurious effect or influence'" on the verdict.

7    Brecht, supra (quoting Kotteakos, supra.).[9]  Moreover, assuming arguendo that petitioner did not

8    receive proper advisements concerning the risks and consequences of giving perjured testimony

9    from either the trial court or his attorney[10], for similar reasons the court cannot find that this error

10   was harmful.  With the advisements, one of three possible paths would have been before

11   petitioner:  to testify truthfully with the assistance of his attorney, to testify in narrative fashion,

12   or to decide not to testify.  Since petitioner represents here that his testimony was truthful and his

13   attorney just misunderstood him, there is no basis for concluding that petitioner would have

14   opted not to testify nor, as the court has already observed, is there any basis in the record for

15   /////

16   _____

17   [8]  The record reflects that the trial took five days, and that the jury deliberated for more
     than five days, sent numerous notes to the trial court over the course of the deliberations, and at
18   one point represented that they were deadlocked.  See Clerk's Transcript on Appeal (CT) at 9-10,
     282-325.  Notwithstanding the apparent rigor of the deliberations, the jury ultimately rejected
19   petitioner's testimony and found him guilty of the charges.

20   [9]  Petitioner also contends that as a result of the in camera hearing he was deprived of the
     right to have counsel argue from his testimony.  See Petition at 13.  Petitioner has no
21   constitutional right to the assistance of counsel in presenting false testimony, U.S. v. Omene, 143
     F.3d 1167, 1171 (9th Cir. 1998) (citing Nix v. Whiteside, 475 U.S. 157, 173-174 (1986), and
22   counsel made it clear that he would argue those parts of the defense case that he considered true.
     Moreover, during deliberations the jury requested the opening and closing statements of defense
23   counsel.  CT at 286.  In response, the court instructed the jury that the "statements are not
     evidence and are therefore inappropriate for you to consider."  CT at 291.

24   [10]  As noted above, petitioner avers that his attorney never warned him about the risks and
     consequences of possible perjury.  Had petitioner been present at the ex parte hearing, he would
25   at a minimum have been present during the trial court's discussion with counsel about whether
     those warnings had been given and he might have received admonitions from the trial court.  See
26   U.S. v. Long, supra.

1  finding that the jury's verdict was based on the fact that petitioner's testimony was provided in

2  narrative fashion.

3          For the reasons set forth in the preceding paragraph, the court cannot find that, in

4  connection with the jury's verdict, the error was harmful under the standard announced in Brecht,

5  nor, under the stringent standard of review that applies in this habeas corpus proceeding, can the

6  court find that the state court's rejection of this aspect of petitioner's first claim was contrary to,

7  or an unreasonable application of, controlling precedent from the United States Supreme Court.

8          Petitioner also contends that he was prejudiced by his exclusion from the hearing

9  because the trial court increased his sentenced by four years and four months more than

10 recommended by the probation department because the judge found that petitioner had lied.  For

11 the reasons set forth infra, petitioner is entitled to relief on this aspect of his ineffective assistance

12 of counsel claim and the court will so recommend.

13          b.  Ineffective Assistance of Counsel

14          Petitioner's second claim is that his trial counsel provided ineffective assistance of

15 counsel by discussing  with the trial court "his belief that petitioner intended to perjure himself

16 without possessing a firm factual basis for that belief,"  Petition, filed December 30, 2002, at 17.

17          The Sixth Amendment guarantees the effective assistance of counsel.  The United

18 States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

19 Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

20 counsel, a petitioner must first show that, considering all the circumstances, counsel's

21 performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

22 identifies the acts or omissions that are alleged not to have been the result of reasonable

23 professional judgment, the court must determine whether, in light of all the circumstances, the

24 identified acts or omissions were outside the wide range of professionally, competent assistance.

25 Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of

26 counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

1    range of professional assistance.'" <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 381 (1986) (quoting

2    <u>Strickland</u>, 466 U.S. at 689).

3           Second, a petitioner must establish that he was prejudiced by counsel's deficient

4    performance. <u>Strickland</u>, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable

5    probability that, but for counsel's unprofessional errors, the result of the proceeding would have

6    been different." <u>Id.</u> at 694. A reasonable probability is "a probability sufficient to undermine

7    confidence in the outcome." <u>Id.</u> <u>See also</u> <u>Williams</u>, 529 U.S. at 391-92; <u>Laboa v. Calderon</u>, 224

8    F.3d 972, 981 (9th Cir. 2000).

9           In <u>Nix v. Whiteside</u>, the United States Supreme Court addressed what constitutes

10   "'reasonable professional' responses to a criminal defendant client who informs counsel that he

11   will perjure himself on the stand." <u>Nix</u>, 475 U.S. at 166. First among the reasonable responses is

12   the duty "to attempt to dissuade the client from the unlawful course of conduct." <u>Id</u>. at 169. This

13   attempt may include the threat to withdraw from representation if the client persists in the desire

14   to commit perjury. <u>Id</u>. at 171. Counsel may also move to withdraw from representation prior to

15   the start of trial. <u>Id</u>. at 170. When counsel learns of proposed perjury during trial, counsel has

16   the option of allowing his client to take the stand and to testify in narrative fashion, unaided by

17   counsel. <u>Id</u>. at 170 n.6. Finally, "an attorney's revelation of his client's perjury to the court is a

18   professionally responsible and acceptable response to the conduct of a client who has actually

19   given perjured testimony." <u>Id</u>. at 170.

20          In the instant case, there is no evidence that petitioner told his attorney that he

21   would commit perjury. Instead, counsel told the court that petitioner wanted to testify in a

22   manner that differed from what petitioner had previously told counsel. Precedent in this and

23   other circuits suggests that an attorney should have a "firm factual basis" for believing that a

24   client will testify falsely before acting on such a belief. <u>See</u>, <u>e.g.</u>, <u>U.S. v. Omene</u>, 143 F.3d 1167,

25   1171 (9th Cir. 1998); <u>United States v. Long</u>, <u>supra</u>, at 444. In the instant case, petitioner's

26   counsel "did not lay out a firm factual basis" for his position. <u>Omene</u>, at 1171. In fact,

1   petitioner's counsel told the court that he had "no firsthand knowledge, and it's just that he gave

2   me one event of the facts, and now he's wanting to testify to another version of the facts."  RT at

3   82.  In addition, counsel chose to raise this perceived conflict with the trial court prior to

4   petitioner's testimony at an ex parte hearing without petitioner present.  Under the circumstances

5   of this case, that decision fell outside the bounds of reasonably competent professional

6   assistance.  For the reasons set forth in Section II.A.2.a supra, there is no reasonable probability

7   that the outcome of petitioner's trial would have been different had counsel not erred, and for

8   those reasons petitioner is not entitled to relief from his conviction.

9           There is, however, a reasonable probability that the outcome of petitioner's

10  sentencing hearing might have been different had counsel not approached the trial court,

11  particularly without petitioner present.  At sentencing, the trial court made the following

12  comment after hearing from petitioner's mother:

13          And it's very unfortunate that Henry, your youngest child, was
        involved in this.  It's a very sad comment on him, not you.
14      Because you have given him opportunities to succeed.  *But he has
        essentially thrown that in your face by not only committing this*
15      *offense*, but lying to this jury in this courtroom.

16  RT at 539.  Subsequently, after hearing from petitioner's father, the trial court said:

17          Both of you, Ms. Trahn and you as well, are good parents.  And
        this has very little to do with you.  In fact, my heart is breaking
18      when I think that Henry would dishonor such wonderful parents as
        you are.  I do not understand his behavior.  It is very peculiar.
19      Particularly given the fact that he was offered to resolve this matter
        by pleading guilty to these charges and doing a much lower
20      sentence.  The one that you're asking me to give him now.

21          Instead, he turned down the People's offer and the Court's offer
        to resolve this like the other young men, and instead dragged me,
22      the District Attorney, the defense attorney, through a long,
        complicated trial.  Which agonized this jury.  They wrote me letter
23      after letter after letter with legal questions and problems.

24          Henry got up on the stand and lied.  *He perjured himself so
        badly that his own attorney could not even ask him questions for
25      fear of getting in trouble himself.*  That is, with the State Bar, the
        person who licenses lawyers in California.

26

So you can see why I would be disappointed at best in Henry's conduct not only in the commission of the robberies in this, case, and being the active instigator of that robbery, but coming to this court and failing to take his punishment early.  And rather than taking his punishment early, he waited and dragged this Court and a lot of lawyers and jurors through a long trial.

That has nothing to do with you and your history of being good parents and good citizens.  And it breaks my heart to see Henry do that to you and to me and to the attorneys.  I have no explanation for it, but I have to deal with it.  And it's my job as a judge.

But that does not change my deep respect and admiration for your family and your daughters and the fact that Henry some day will leave state prison and hopefully be a good citizen. *But he is going to go to prison for a long time based upon his conduct in this case and his conduct in this courtroom.*  And I'm so sorry as a judge that I have to treat him this way.

*But he has earned every year, every day, every month that I'm going to impose.  Because he's dishonored you and he's dishonored this courtroom, where I expect honesty and forthrightness.*

RT at 542-543 (emphasis added).  Subsequently, the court imposed a sentence of twenty-three years and eight months in state prison, a sentence longer by four years and four months than that recommended by the probation department.  In adding to the recommended sentence, the court stated:

For the benefit of the record, I felt it was unfair basically to the People to allege only two of the six victims in this case for purposes of sentences sentencing.  And I have, therefore, chosen three of the victims and added an additional 4 point 4, that is 4 years 4 months to the sentence recommended by the Probation Department.  That 4 years 4 months being consecutive to the principle term of 15.

RT at 545.

In <u>Lowery v. Cardwell</u>, 575 F.2d 727 (9th Cir. 1978), the United States Court of Appeals for the Ninth Circuit held that a habeas petitioner was entitled to relief on the ground that his right to due process had been violated when his attorney informed the finder of fact that the attorney had formed a belief that his client's defense was based on false testimony.  The court

of appeals found that the attorney had "disabled the fact finder from judging the merits of the

defendant's defense." Lowery, at 730.  While the trial court was not the trier of fact as to the

criminal charges against petitioner, he was the final arbiter at sentencing.  Counsel's decision to

seek the court's guidance and to acquiesce in the exclusion of his client from the in camera

hearing, disabled the trial court from independently judging petitioner's veracity, cf. U.S. v.

Omene, 143 F.3d at 1171.  It is apparent from the record that the trial court's assessment of

petitioner's veracity had a significant impact on the sentencing hearing.[11]  At the start of the

sentencing hearing, the court indicated that it was considering adding an additional two year

consecutive term to include a third victim in the sentencing formula, but that it was only a

tentative decision which the court would "feel free to change depending on what I hear this

morning."  RT at 532.  As noted, the court ultimately added an additional four years and four

months to petitioner's sentence.[12]

  For the foregoing reasons, this court finds that petitioner was prejudiced at

sentencing by his counsel's decision to discuss his concerns about petitioner's testimony with the

court in petitioner's absence, and the state court's rejection of this aspect of this claim was an

unreasonable application of clearly established United States Supreme Court precedent.

Petitioner is entitled to relief from the sentence imposed by the trial court.

  B. Claim Three

  Petitioner claims that the trial court denied him effective assistance of counsel

during his testimony by forcing him to testify in a narrative style, unrepresented by counsel, and

---

[11] On direct appeal, the state court of appeal found that the trial court used petitioner's "perceived perjury" to reject petitioner's parents' request for leniency at sentencing.  Ex. D to Answer, People v. Nguyen, slip op. at 26.

[12] Petitioner's attorney interposed no objection to the court's reliance on petitioner's alleged perjury.  During sentencing, petitioner's counsel made the following statement:  "We understand and respect the Court's desire to send a message both for not taking the offer and for Henry's conduct in the courtroom.  And I'd just like to point out that the sentence prescribed in the probation report adequately sends that message.  It's doubling basically the offer that he got from the prosecution.  That's a long time."  RT at 543.

1   by failing to adequately warn him of the risks of testifying without the assistance of counsel.

2   Petitioner also alleges that counsel was required to withdraw in order to avoid a conflict of

3   interest.  The last reasoned rejection of this claim is the decision of the California Court of

4   Appeal for the Third Appellate District on petitioner's direct appeal.  See Ex. D to Answer,

5   People v. Nguyen, No. C032643, slip op. at 6-14.

6         The state appellate court denied petitioner's first subclaim claim, that the court

7   denied him effective assistance of counsel in forcing him to testify in a narrative style, on the

8   ground that under California law the narrative approach had been deemed the "'best

9   accommodation of the competing interests of the defendant's right to testify and the attorney's

10   obligation not to participate in the presentation of perjured testimony.'"  People v. Nguyen, slip

11   op. at 9 (quoting People v. Johnson, 62 Cal.App.4th 608, 629 (1998).  The state court of appeal

12   also found that counsel had not duty to withdraw upon forming  belief that petitioner might

13   present false testimony, id. at 9-10, and that the court had no obligation to warn petitioner of the

14   risks of testifying without the assistance of counsel and, in any event, that defense counsel had

15   assured that the court that he had warned and advised petitioner.  Id. at 10-14.

16         For the reasons set forth in section IIA, supra, petitioner cannot show cognizable

17   prejudice from the events underlying his third claim for relief.  The state court's rejection of this

18   claim was neither contrary to nor an unreasonable application of clearly established United States

19   Supreme Court precedent.  This claim should be denied.

20       C. Claim Four

21         Petitioner alleges that the prosecutor committed prejudicial misconduct and

22   violated his constitutional rights to due process and a fair trial.  Specifically, petitioner claims

23   that (1) the prosecutor impermissibly denigrated him during the prosecution's closing arguments

24   by calling him a liar and idiot; (2) the prosecutor impermissibly referred to facts not in evidence

25   and vouched for prosecution witnesses; and (3) the prosecutor impermissibly attempted to shift

26   the burden of proof by stating "You cannot prove Johnny Nguyen is a liar in this case."  (Petition

1    at 43-47.)  The last reasoned rejection of this claim is the decision of the California Court of

2    Appeal for the Third Appellate District on petitioner's direct appeal.  The state court of appeal

3    rejected the first argument, finding that the prosecutor's remarks about petition "were reasonable

4    inferences based on the evidence in the case."  Ex. D to Answer, People v. Nguyen, slip op. at

5    16.  The state court of appeal rejected the contentions that formed the second part of the claim for

6    the same reason.  Id. at 16-20.  Finally, the state court of appeal rejected petitioner's contention

7    that the prosecutor attempted to shift the burden of proof, finding that the prosecutor "did not

8    instruct the jury on the law . . . .  Rather, he merely argued the prosecution witness was more

9    credible than the [petitioner]."  Id. at 20.  Finding no individual instance of prosecutorial

10   misconduct, the state court of appeal also found no cumulative prejudice.  Id. at 21.

11            A criminal defendant's due process rights are violated if prosecutorial misconduct

12   renders a trial fundamentally unfair.  See Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000)

13   (quoting Darden v. Wainwright, 477 U.S. 168, 183 (1986)).  "[T]he touchstone of due process

14   analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability

15   of the prosecutor."  Smith v. Phillips, 455 U.S. 209, 219 (1982).  Thus, the federal habeas court

16   must distinguish between "ordinary trial error of a prosecutor and that sort of egregious

17   misconduct . . . amount[ing] to a denial of constitutional due process."  Donnelly v.

18   DeChristoforo, 416 U.S. 637, 647-48 (1974).  See also Johnson v. Sublett, 63 F.3d 926, 929 (9th

19   Cir. 1995).   In order to determine whether a prosecutor engaged in misconduct, it is necessary to

20   examine the entire proceedings and place the prosecutor's remarks in context.  See United States

21   v. Robinson, 485 U.S. 25, 33 (1988) ("[P]rosecutorial comment must be examined in context. . .

22   ."); Greer v. Miller, 483 U.S. 756, 765-66 (1987); Williams v. Borg, 139 F.3d 737, 745 (9th Cir.

23   1998).  Relief on such claims is limited to cases in which the petitioner can establish that

24   prosecutorial misconduct resulted in actual prejudice.  See Johnson, 63 F.3d at 930 (citing Brecht

25   v. Abrahamson, 507 U.S. 619, 637-38 (1993)); see also Darden, 477 U.S. at 181-83.  In this

26   vein, prosecutorial misconduct violates due process when it has a substantial and injurious effect

1  or influence in determining the jury's verdict.  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899

2  (9th Cir. 1996).

3          After review of the record, this court finds that the state court's rejection of this

4  claim was neither contrary to nor an unreasonable application of the foregoing principles of

5  federal law.   Consequently, this claim should be denied.

6          D.  Claim Five

7          Petitioner's final claim is that the trial court impermissibly increased his sentence

8  by four years and four months beyond the sentence recommended in the probation report based

9  on the judge's belief that petitioner perjured himself and to punish petitioner for exercising his

10  constitutional right to a jury trial.  On direct appeal, the state court of appeal rejected this claim.

11  With respect to petitioner's contention that the trial judge had increased his punishment for

12  rejecting the plea offer and exercising his right to jury trial, the state court found that the court's

13  expressions of displeasure were "a reflection of [petitioner]'s perjury rather than [petitioner]'s

14  assertion of his right to trial by jury."  Ex. D to Answer, People v. Nguyen, slip op. at 25.  The

15  state court of appeal also rejected petitioner's contention that the trial judge impermissibly relied

16  on his belief that petitioner had perjured himself as follows:

17          The United States Supreme Court has recognized "[i]t is rational
           for a sentencing authority to conclude that a defendant who
18          commits a crime and then perjures herself in an unlawful attempt
           to avoid responsibility is more threatening to society and less
19          deserving of leniency than a defendant who does not so defy the
           trial process." (United States v. Dunnigan (1993) 507 U.S. 87, 97
20          [122 L.Ed.2d 445, 455].)  The trial court therefore used
           [petitioner]'s perceived perjury properly, as evidence of
21          [petitioner]'s character and likelihood of rehabilitation, to
           determine if he merited the leniency his parents requested.
22

23  Id. at 26.  The state court of appeal also rejected petitioner's claim that the trial court erred in

24  failing to "state the manner in which it used perjury in determining [petitioner]'s sentence."  Id.

25  The state court held that the trial court was not required to state on the record how the perjury

26  was used, and that petitioner had waived the constitutional requirement that, "when using perjury

as an aggravated factor in sentencing" a trial court must make ""on-the-record findings encompassing all the elements of a perjury violation."" Id. at 27 n.3 (quoting *People v. Howard*, 17 Cal.App.4th 999, 1004 (1993)).

In United States v. Dunnigan, 507 U.S. 87 (1993), the United States Supreme Court held that the United States Constitution "permits a court to enhance a defendant's sentence [under the applicable federal sentencing guideline], if the court finds the defendant committed perjury at trial." Dunnigan, at 88-89. In so holding, the Court held, in part, that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same" under the perjury definition set out by the Court. Id. at 95. For the reasons set forth supra, petitioner is entitled to habeas corpus relief on the ground that he was prejudiced at sentencing by ineffective assistance of counsel in connection with the information provided to the court at the in camera hearing held in petitioner's absence.[13] For that reason, this court will not make separate recommendations on the instant claim.

For all of the foregoing reasons, petitioner suffered cognizable constitutional harm in connection with the sentence imposed following his conviction. There remains the question of the appropriate remedy.

> Federal courts are authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus matters 'as law and justice require.' " Hilton v. Braunskill, 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). Habeas remedies " 'should put the defendant back in the position he would have been in if the Sixth Amendment violation never occurred.' " Nunes v. Mueller, 350 F.3d 1045, 1057(9th Cir.2003) (quoting United States v. Blaylock, 20 F.3d 1458, 1468 (9th Cir.1994)).

---

[13] In the instant case, as noted above, counsel interposed no objection to the court's statements about petitioner's alleged perjury and it would appear that, having informed the court directly that he had reason to doubt his client's anticipated testimony, counsel was in no position to do so. While petitioner is not entitled to the assistance of counsel in committing perjury, he was entitled to conflict-free representation of counsel at sentencing.

1  Chioino v. Kernan, 581 F.3d 1182, 1184 (9th Cir. 2009).  In the instant case, the Sixth

2  Amendment violation occurred at the in camera hearing, which took place during trial, and the

3  prejudice occurred at sentencing.  Accordingly, the court will recommend that petitioner's

4  application for writ of habeas corpus be granted and that the State of California be given a period

5  of thirty days in which to elect whether to retry petitioner or to resentence him.

6            For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that:

7            1.  Petitioner's application for a writ of habeas corpus be granted as to the

8  sentence imposed following his conviction;

9            2.  The State of California be granted a period of thirty days in which to elect to

10  retry petitioner or to resentence him.

11            These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

13  days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

16  objections shall be filed and served within fourteen days after service of the objections.  The

17  parties are advised that failure to file objections within the specified time may waive the right to

18  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19  DATED: August 2, 2010.

20

21

22  UNITED STATES MAGISTRATE JUDGE

23  12/nguy2758.hc

24

25

26

26